

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 1 6 2019

CLERK, U.S. DISTRICT COURT
By_____
                Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL WAYNE GRIFFITH,          §
                                 §
          Petitioner,            §
                                 §
v.                               §      No. 4:18-CV-543-A
                                 §
LORIE DAVIS, Director,           §
Texas Department of Criminal     §
Justice, Correctional            §
Institutions Division,           §
                                 §
          Respondent.            §

### MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Michael Wayne Griffith, a
state prisoner confined in the Correctional Institutions Division
of the Texas Department of Criminal Justice, against Lorie Davis,
director of that division, respondent. After having considered
the pleadings, state court records, and relief sought by
petitioner, the court has concluded that the petition should be
denied.

### I. FACTUAL AND PROCEDURAL HISTORY

In July 2013 a jury in Tarrant County, Texas, Case No.
1223635D, found petitioner guilty of aggravated assault with a
deadly weapon, a firearm, in the shooting of Darren Rhea and
assessed his punishment at 20 years' confinement. (Clerk's R.
51.) Petitioner's conviction was affirmed on appeal and the Texas

Court of Criminal Appeals refused his petition for discretionary review. (J.; Electronic R.) Petitioner also sought post-conviction state habeas-corpus relief by challenging his conviction in a state habeas application, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (SHR[1] 2-19 & Action Taken.) This federal petition followed.

The state appellate court summarized the evidence at trial as follows:

> Darren Rhea owns an airplane hangar at Hicks Airfield in Tarrant County, Texas. Rhea used the hangar to store equipment and trailers. [Petitioner] also owned and lived in a hangar at Hicks Airfield. Rhea hired [petitioner] to do routine maintenance on his pool. When Rhea began having trouble with the pool pump, he asked [petitioner] to fix it. [Petitioner] worked on the pool pump, but he did not fix the problem, and Rhea had to hire someone else. According to Rhea, [petitioner] put used, rusty parts into the pool pump. Rhea did not want to pay [petitioner] the full amount for the repair job since he had not repaired the problem with the pool pump and it had been necessary to hire someone else. He saw [petitioner] at the hangar and they had a conversation about the situation and what Rhea owed him. Rhea told [petitioner] that he did not want to pay the full amount for the repairs. He described it as the "last normal conversation" he had with [petitioner]. Over the next several weeks, [petitioner] became increasingly angry and agitated. On two different occasions, [petitioner] sat in his truck outside of the hangar and repeatedly screamed "I want my money!" while honking the horn continuously for about twenty minutes. [Petitioner] arrived at the hangar another day and came inside to yell and cuss at Rhea about the unpaid repair

---

[1] "SHR" refers to the record in petitioner's state habeas proceeding in WR-87,456-01.

bill. Rhea suggested that they take the matter to JP Court to resolve it, but [petitioner] refused. Rhea asked [petitioner] to leave, but Rhea did not act aggressively towards him.

On November 26, 2010, Rhea went to the hangar with his ten-year-old son [Jake Rhea] at about 5:30 p.m. to get a trailer to transport four-wheelers. As they were hooking up the trailer, Rhea saw [petitioner] sitting in his truck with the headlights turned off. After a couple of minutes, Rhea saw the truck's headlights illuminate and the truck moved towards his hangar. [Petitioner] pulled the truck up to the hangar so that the front of the truck was in the doorway, and he immediately started yelling and cussing at Rhea. [Petitioner] was extremely agitated, red-faced, and disheveled. Rhea sensed that this was not going to be a short visit by [petitioner], so he sent his son upstairs to get a soft drink. Rhea told [petitioner] to stop cussing in front of his son and to get out of the truck if he wanted to talk. Rhea had started walking towards the truck when he noticed that [petitioner] looked different than he had seen him before and he appeared to be in a rage. Just as Rhea noticed the barrel of a gun pointing out of the truck window, his body was suddenly spun around so that he was facing the hangar. After a couple of seconds, Rhea realized [petitioner] had shot him in the abdomen, and he turned back around and said to [petitioner], "You shot me." Fearing for his son, Rhea watched [petitioner] to see what he was going to do. When [petitioner] backed up the truck and drove slowly away, Rhea and his son got into their truck. Rhea called 911 as he drove towards the front gate of the airfield. Emergency responders met Rhea at the gate and transported him to a hospital where he underwent surgery to remove a portion of his large intestine damaged by the bullet.

Law enforcement officers were in the process of securing the crime scene at Rhea's hangar when [petitioner] called 911. [Petitioner] told the 911 operator he was at his hangar and indicated that he would come outside unarmed. When officers arrived at that location, [petitioner] came out of the hangar with his hands up, but he refused to consent to a search of the hangar or his vehicle. The Tarrant County Sheriff's Department obtained a search warrant for [petitioner]'s hangar and truck. Deputies conducted a search and

3

found a .22 caliber revolver in the cup-holder of
[petitioner]'s vehicle.

(Op. 1-3.)

Petitioner testified at trial that he suffered from
myositis, a degenerative nerve disorder, that makes him weak;
that Rhea never complained about the work done on his pool but
refused to pay for it; that he had repeatedly sent bills and
certified letters to Rhea with no response; that every time he
saw Rhea at his hangar he asked Rhea nicely for payment without
using derogatory terms or profanity; that on the evening in
question Rhea approached his truck in an aggressive manner,
punched him in the mouth, and tried to pull him through the
window of his truck; that, fearing serious bodily injury or
death, he fired a warning shot out the window in self-defense so
Rhea would let him go; and that he backed away without knowing
whether he had shot Rhea. He went to his hangar, called 911, and
reported that he had been assaulted and may have shot someone.
(Reporter's R., vol. 3, 211-29; Pet'r's Br. 4-5.)

## I. ISSUES

In one ground, petitioner claims he received ineffective
assistance of trial counsel in various respects. (Pet. 5.[2])

## III. RULE 5 STATEMENT

Respondent believes that petitioner has sufficiently

---

[2]The petition is not paginated; therefore, the pagination in the ECF
header is used.

exhausted his state court remedies as to the claims raised and that the petition is not otherwise barred by successiveness or the federal statute of limitations. (Resp't's Answer 5.)

## IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011).

The statute also requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000). Additionally, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief on a federal claim

without written opinion, a federal court may presume that the
state court adjudicated the claim on the merits in the absence of
any indication or state-law procedural principles to the contrary
and applied the correct "clearly established federal law" in
making its decision. *Johnson v. Williams,* 568 U.S. 289, 298
(2013); *Richter,* 562 U.S. at 99. In such a situation, a federal
court "should 'look through' the unexplained decision to the last
related state-court decision providing" particular reasons, both
legal and factual, "presume that the unexplained decision adopted
the same reasoning," and give appropriate deference to that
decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018).

## V. DISCUSSION

A criminal defendant has a constitutional right to the
effective assistance of counsel at trial. U.S. CONST. amend. VI,
XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To
establish ineffective assistance of counsel, a petitioner must
show (1) that counsel's performance fell below an objective
standard of reasonableness, and (2) that but for counsel's
deficient performance the result of the proceeding would have
been different. *Strickland*, 466 U.S. at 688. In applying this
test, a court must indulge a strong presumption that counsel's
conduct fell within the wide range of reasonable professional
assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's
performance must be highly deferential and every effort must be

6

made to eliminate the distorting effects of hindsight. *Id.* at 689.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1). *See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the ineffective-assistance claims on the merits, this court must review petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases, the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable" or whether the state court's factual determination on which the decision was based was unreasonable in light of the evidence presented in the state court proceedings. *See Richter,* 562 U.S. at 105; *Wood v. Allen,* 558 U.S. 290, 299 (2010).

Petitioner was represented at trial by Steven G. King and Erik C. Hudak. Petitioner asserts that counsel were ineffective by failing to—

    (1)   file a motion in limine and object to police opinion testimony that Rhea was telling the truth and petitioner was lying;

    (2)   file a motion in limine and object to repeated references by the prosecutor and police officers

to Rhea as the "victim";

(3) file a motion in limine and object to testimony that petitioner concealed loaded long guns in his apartment; and

(4) object to the prosecutor's opinion that Rhea's son was telling the truth.

(Pet'r's Br. 12-21.)

Petitioner raised his ineffective-assistance claims in the state habeas proceeding, however Steven G. King refused to answer written questions concerning the trial from petitioner's habeas counsel, disregarded the habeas court's order to provide an affidavit responding to the claims, and subsequently committed suicide. (Id. at 11; SHR 75-104, 152.) Erik C. Hudak, a newly-licensed attorney, did provide an affidavit in the state habeas proceeding responding to the claims, in relevant part, as follows:

> On July 22, 2013, I met Mr. King for the first time. That morning, prior to jury selection, he provided me with the background of the case, the nature of the defense strategy, and introduced me to [petitioner]. We began to review juror information forms, so that he could identify individuals that he wanted to focus on. Later that day, jury selection occurred. My task was to observe facial reactions and note responses. I discussed with Mr. King his choices of peremptory strikes, and two jurors' potential grounds for dismissal for cause. Mr. King made the ultimate selections, and a jury was empaneled. I was given a research assignment prior to the trial the next day, to confirm the necessary elements of self-defense in one's vehicle.

> During the trial itself, my role was limited to taking notes and observing the jury. I was not there to

8

actively try the case, but to learn. I was asked, at
one point, to review [petitioner]'s medical records, to
double-check his own analysis. Such notes as I did take
that week were returned to Mr. King at the conclusion
of the trial, as part of his document retention
policies, along with copies of [petitioner]'s medical
records.

Throughout the week, Mr. King would offer some of
his insights to me. After Jake Rhea's testimony, he
commented that the witness had testified extremely
well, especially given his young age and the overall
situation, and that his own cross-examination of him
was measured against the image of how it would play to
a jury. Mr. King had said that he wanted to essentially
move the jury past Jake Rhea's testimony. He did not
specifically tell me whether a lack of objection to the
prosecutor's closing argument was a part of this
strategy or not, and I am not making any inferences to
that end.

Mr. King made no comment to me about Detective
Quintana's testimony or to references about references
to Mr. Rhea as the "victim." Mr. King made no comment
to me about his impressions on the issue of the police
opinion testimony on the truth/falsity of
[petitioner]'s testimony, nor did he comment about the
police opinion testimony on whether the complainant
inflicted [petitioner]'s injuries.

After Mr. King's motion in limine regarding the
evidence collected from [petitioner]'s hangar was
denied, the prosecution presented evidence and
testimony regarding [petitioner]'s possession of
various long guns, which included a photograph of those
weapons as found. Mr. King did not object, and the
photograph, which was shown to the jury on an overhead
display was left up for what seemed, to me, to be an
overly long period of time. I asked Mr. King about it,
and he noted, in effect, that he could have objected to
that, but chose not to, on the basis that he did not
want to signal to the jury that that was a point they
should pay extra attention to. This was related to my
question about the display of the picture—I did not ask
about the testimony of Steven Seabolt or Detective
Quintana in particular, and I do not know, either way,
whether a lack of objection to their testimony was
strategic on this point.

9

Upon the conclusion of the trial, I returned all papers from the case to Mr. King, and had no discussions with him about the trial.

(SHR 130-32.)

Petitioner submitted the affidavit of attorney Brian W. Wice, an expert witness in post-conviction writs of habeas corpus and motions for new trials on the area of ineffective assistance of counsel, wherein Wice averred:

### 1-2. Detective Quintana's Opinion Testimony

I am of the professional opinion that it was objectively deficient conduct under prevailing professional norms for trial counsel not to file a motion in limine and object to Detective Quintana's opinion testimony that:

- She did not believe [petitioner]'s story that the "victim" tried to crawl inside the truck to pull him out and that the "victim" did not tell her anything that differed from what she believed happened.

- She did not believe that the complainant inflicted [petitioner]'s injuries because, had a man the complainant's size punched [petitioner], she would have expected to see "significant" facial injuries.

In a case such as this where the credibility of the accused and the complainant is the central issue, I can conceive of no sound trial strategy that any reasonable lawyer would employ that could explain not filing a motion in limine to exclude this patently inadmissible and prejudicial testimony. Neither can I imagine any sound trial strategy that any reasonable lawyer would employ that would explain not making a timely and specific objection to this testimony in the event the trial court denied the motion in limine and opted to admit it. There was no tactical downside to filing a motion in limine and securing a ruling outside the jury's presence and renewing that objection before the jury. Not doing so produced no tactical benefit.

### 3. Repeated Prosecutorial References to the "Victim"

I am of the professional opinion that it was objectively deficient conduct under prevailing professional norms for trial counsel not to file a motion in limine and object to repeated references by the prosecutor to the complainant as the "victim." Not only is the use of the term "victim" one that impermissibly pre-supposes that an offense has been committed, and constitutes an improper comment on the weight of the evidence, it is inherently prejudicial in a case such as this where the defense raised is self-defense, and where the credibility of the parties is paramount. I can conceive of no sound trial strategy that any reasonable lawyer would employ that could explain not filing a motion in limine to exclude these repeated references. Neither can I imagine any sound trial strategy that any reasonable lawyer would employ that would explain not making a timely and specific objection to this testimony in the event the trial court denied the motion in limine and opted to admit it. There was no tactical downside to filing a motion in limine and securing a ruling outside the jury's presence and renewing that objection before the jury. Not doing so produced no tactical benefit.

### 4. Testimony that [Petitioner] Concealed Loaded Long Guns in his Apartment

I am of the professional opinion that it was objectively deficient conduct under prevailing professional norms for trial counsel not to file a motion in limine and object to testimony from Investigator Seabolt that [petitioner] concealed loaded long guns in his apartment as well as Detective Quintana's testimony that she had never seen loaded guns hidden under bed covers and that this made her nervous. Because I believe that this testimony did not make more or less likely a fact of consequence in [petitioner]'s trial, it was irrelevant and inadmissible. As with the admission of any extraneous offense, this testimony was calculated to impress upon jurors the notion that [petitioner] was a criminal and bad person generally. I can conceive of no sound trial strategy that any reasonable lawyer would employ that could explain not filing a motion in limine to exclude these repeated references. Neither can I imagine any sound trial strategy that any reasonable lawyer would

11

employ that would explain not making a timely and
specific objection to this testimony in the event the
trial court denied the motion in limine and opted to
admit it. There was no tactical downside to filing a
motion in limine and securing a ruling outside the
jury's presence and renewing that objection before the
jury. Not doing so produced no tactical benefit.

### 5. The Prosecutor's Opinion that the Complainant's Son was Telling the Truth

I am of the professional opinion that it was
objectively deficient conduct under prevailing
professional norms for trial counsel not to object to
the prosecutor's opinion that the complainant's son was
telling the truth when he testified. I can conceive of
no sound trial strategy that any reasonable lawyer
would employ that would explain trial counsel's failure
to object to improper prosecutorial argument of this
type. There was no tactical downside to making a timely
and specific objection to this argument, requesting an
instruction to disregard it, and then, if necessary,
requesting a mistrial. Not preserving error in the face
of this improper prosecutorial argument produced no
tactical benefit.

(SHR 211.)

Based upon the documentary record, the pleadings, counsel's
affidavits, and two teleconferences, the state habeas court
entered the following relevant factual findings and legal
conclusions, which although numerous are included to assist the
reader:

### FINDINGS OF FACT

*General Facts*

. . .

6.  King committed suicide on June 19,2017.

7.  King's death was unforeseen.

8. On August 28, 2017, a teleconference was held between the court, [petitioner]'s counsel ("Mr. Schaffer"), and the State's counsel ("Ms. Jacobs").

9. During the August 28, 2017, teleconference, the circumstances regarding Mr. Schaffer's attempts to get information from King were discussed.

10. [Petitioner] did not request a record of the August 28, 2017, teleconference be made, and no record was made.

11. On October 24, 2017, a teleconference was held between the court, Mr. Schaffer, and Ms. Jacobs.

12. During the October 24, 2017, teleconference, the typical experiences and procedures of [petitioner]'s counsel and the Tarrant County court system were discussed.

13. [Petitioner] did not request a record of the October 24, 2017, teleconference be made, and no record was made.

14. During the August 28, 2017, and October 24, 2017, teleconferences, this Court learned the following:

   • During the direct appeals process, Mr. Schaffer contacted King and requested that he respond to [petitioner]'s ineffective assistance of counsel concerns.

   • King refused to respond to Mr. Schaffer's questions.

   • As part of his normal course of business, Mr. Schaffer contacts every attorney against whom he anticipates raising an ineffective assistance of counsel claim.

   • At the current time, only about fifty percent of the attorneys contacted respond to Mr. Schaffer's requests for information.

   • Early in the writ proceedings, Mr. Schaffer contacted Ms. Jacobs regarding his motion for an evidentiary hearing.

- Ms. Jacobs advised Mr. Schaffer that the State would first request an affidavit from King before deciding whether to join in his motion for an evidentiary hearing.

15. The fact that King did not respond to Mr. Schaffer's questions is not unique to King.

16. This Court is aware that, in Tarrant County, the routine practice is for the trial court to wait to make a decision on whether to hold a hearing until after affidavits are ordered, received from counsel, and considered by the court.

17. This Court is aware that, in the last eight years, almost all, if not all, hearings held in Tarrant County on article 11.07 writ proceedings were not ordered until after affidavits had been ordered and filed.

18. This Court had not yet ruled on [petitioner]'s motion for an evidentiary hearing when King died.

19. The fact that the State did not consider agreeing to a hearing prior to an affidavit being filed by trial counsel is not unique to this case.

20. The fact that the trial court did not grant [petitioner] a hearing prior to an affidavit being filed is not unique to this case.

21. The fact that the trial court ordered King to file an affidavit is no indication on whether [petitioner]'s claims had merit.

. . .

23. King did not file his affidavit before his death on June 19, 2017.

24. This Court is aware that it is not uncommon for affidavits to be filed after their due dates in Tarrant County.

25. The fact that King did not timely file his affidavit is not unique to this case.

26. This Court is aware that it is routine in Tarrant

County for a representative of the court to contact an affiant after his affidavit is thirty days past due.

27. Because King's affidavit was not over thirty days past due, the court had not yet contacted him at the time of his death.

28. There is no evidence of any connection between [petitioner]'s case and King's death.

29. There is no evidence that King's death is relevant to whether he provided [petitioner] effective assistance of counsel.

30. There is no evidence that [petitioner] was harmed by the parties' inability to obtain an affidavit or testimony from King.

31. There is no evidence that [petitioner] was constructively denied counsel during trial.

32. There is no evidence that [petitioner]'s conviction was the result of a structural error.

33. There is no evidence that applying the normal *Strickland v. Washington* standard for [petitioner]'s ineffective assistance of counsel claims violates [petitioner]'s right to due process.

34. There is no evidence, or authority, to support [petitioner]'s claim that his right to due process requires *Strickland*'s presumption of objectively reasonable representation not apply in this case.

    . . .

36. There is no evidence, or allegation, that [petitioner]'s defense file is available.

37. Based on the nature of [petitioner]'s claims that counsel failed to object at trial to certain matters, there is no evidence that King's defense file would provide any relevant information.

38. [Petitioner]'s claims can be decided without King's defense file.

*Ineffective Assistance of Counsel*

General Representation

      .  .  .

43. Because King accessed the complete State's file through the Tarrant County Criminal District Attorney's Office's open-file policy, King concluded discovery motions were unnecessary.

44. The Tarrant County Criminal District Attorney's Office's open-file policy provided King access to more information than was required under the Texas Code of Criminal Procedure.

45. As part of the Tarrant County Criminal District Attorney's Office's open-file policy, King received a *Brady* notice, an offense report regarding [petitioner], and all of the evidence in this case.

46. King filed a motion to suppress [petitioner]'s custodial statements.

47. The State agreed to King's motion to suppress [petitioner]'s custodial statements, and the trial court granted it.

48. King moved to suppress the marijuana found in [petitioner]'s home.

49. During trial, the trial court denied the motion to suppress the marijuana.

50. King made a motion in limine regarding bad acts under Rule 404(b), of the Texas Rules of Evidence.

51. In response to King's motion in limine, the State stated it instructed its witness not to testify regarding a golf cart incident at a party where [petitioner] was intoxicated and hurt himself by acting foolishly.

52. In response to King's motion in limine, the State stated it instructed its witness not to testify regarding any "conspiracy theory" evidence involving [petitioner] wanting to go to Somalia

and fight fires with guns.

53. In response to King's motion in limine, the State agreed not to go into the discovery of [petitioner]'s home-based marijuana farm during the guilt/innocence phase unless [petitioner] "opened the door."

54. King did not "open the door," and testimony and evidence of [petitioner]'s home-based marijuana farm was not presented during the guilt/innocence phase of trial.

55. Before the State presented testimony and evidence during the punishment phase of trial regarding the marijuana found in [petitioner]'s home, King requested a running objection.

56. The trial court overruled King's objection but permitted the running objection.

       . . .

Quintana - Opinion Testimony

59. Quintana was the detective assigned to oversee the investigation of this offense.

60. Quintana testified that it was important to know as much information as possible to determine how to proceed with the investigation and what evidence to collect.

61. CSI Steven Seabolt ("Seabolt") inspected and photographed the driver's side door of [petitioner]'s vehicle.

62. Seabolt noticed a uniform layer of dust on the driver's side door.

63. Seabolt testified that the layer of dust on the driver's side door was significant because the dust would have been disturbed if there had there been a struggle at the door or if someone was being pulled out of the vehicle.

64. Quintana testified that the victim's son told her that the victim had a gun which he kept in a safe.

. . .

66. Quintana admitted that the presence of the dust on the car door went to the heart of the self-defense issue.

67. King attempted to impeach Quintana's testimony regarding the presence of the dust by pointing out that Quintana failed to put the information in her report.

68. Quintana testified that it was significant that she and Seabolt personally observed a sheen of dust on the outside of [petitioner]'s driver side door.

69. Quintana testified as follows about the significance of the sheen of dust:

> "Because it indicated to us that the story from the defendant to that point that there had been a physical confrontation at the door of that truck and that the victim had tried to crawl inside of the truck to pull him out could not have taken place because that dust was not disturbed."

70. Quintana testified that the lack of any pattern in the dust "[m]eant to [her] that [the victim] was not near the door of the truck when he got shot."

71. Quintana concluded that the victim "[d]idn't touch the door."

72. Quintana testified that nothing from her interview with the victim departed from what she believed happened.

73. [Petitioner] testified that the victim was "a big enough man [that] he [could] reach in that vehicle and grab ahold of [petitioner] without ever touching the vehicle."

74. Quintana investigated [petitioner]'s injuries and learned:

- The victim was right-handed.
- [Petitioner] was seated in his truck.
- [Petitioner] alleged that the victim punched his face.
- "[T]he injury that [petitioner] sustained was dry blood coming from the right side of his nose, perhaps a little bit to the right side of his upper and lower lip."
- The victim is a big man who was probably 6'5" tall and weighed 220-240 pounds.

75. Quintana has investigated many fights during her career, and she concluded the following:

- A right-handed person would punch a person on the left side of his face.
- A person of the victim's stature would cause significant facial injury if he "cold-cocked" somebody.
- [Petitioner]'s injuries were not caused by the victim.

76. Quintana testified

> "I would expect to see a significant -- especially a facial injury. I think the size of [the victim], even without all out hitting somebody would cause significant injury."

77. In response to a question about whether she believed [petitioner]'s injuries were caused by the victim, Quintana responded, "I do not."

78. Quintana did not testify that she did not believe [petitioner]'s story that the victim tried to attack him.

79. Quintana did no[t] comment on the credibility of [petitioner] or the victim.

80. Quintana did not comment on [petitioner]'s guilt.

81. Quintana testified regarding her opinions and inferences that were rationally based on her experience and her perception as an investigator in this case.

82. Quintana's testimony was admissible pursuant to Texas Rules of Evidence 701 and 704.

83. There is no evidence that the trial court would have erred in overruling an objection to Quintana's testimony regarding her opinions and inferences.

84. Because the testimony was admissible, there is a plausible basis in apparent trial strategy for not making a motion in limine regarding Quintana's testimony.

85. Because the testimony was admissible, there is a plausible basis in apparent trial strategy for not objecting to Quintana's testimony.

86. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected or filed a motion in limine regarding Quintana's testimony.

Use of Term "Victim"

87. The term "victim" was used throughout the guilt/innocence phase of trial by the State and the State's witnesses.

88. King did not object to the use of the term "victim."

89. King did not file a motion in limine regarding the use of the term "victim."

90. The trial court did not use the term "victim."

91. The court's charge did not include the term "victim."

92. In light of the strength of the State's case and the weakness of [petitioner]'s self-defense case, there is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel filed a motion in limine or objected to the State's and State's witnesses use of the term "victim."

Evidence and Testimony about Long Guns

93. On July 23, 2013, King filed a motion to suppress the firearms found in [petitioner]'s hangar.

94. On July 24, 2013, the trial court heard King's motion to suppress during trial.

95. The trial court denied King's motion to suppress the firearms and any related testimony.

96. King's decision to file a motion to suppress the firearms found in [petitioner]'s hangar was the result of reasonable trial strategy.

97. [Petitioner] raised, and the appellate court rejected, two grounds that the trial court erred in denying his motion to suppress.

98. No evidence of the firearms was presented to the jury before the trial court denied King's motion to suppress.

99. King's decision to make a motion in limine regarding the firearms when he had filed a motion to suppress has a plausible basis in strategy.

100. Quintana testified that investigators found long guns "loaded and made ready" in [petitioner]'s living area.

101. Quintana testified that she found it peculiar that [petitioner] had loaded guns under his bed covers.

102. Seabolt searched and photographed [petitioner]'s living area inside his hangar.

103. King noted [petitioner] had "[n]o objections other than our previous motion."

104. Seabolt inspected [petitioner]'s bed found in the hangar bedroom.

105. Seabolt noticed [petitioner]'s bed was loosely made with the comforter pulled up over it.

106. Seabolt discovered four firearms under the comforter.

107. The firearms were fully loaded, each with a

chambered round.

108. The firearms were not all pointed the same way.

109. Seabolt did not collect the firearms because they had no "pertinent evidentiary value" as they did not match the description of the offense weapon, which was described as a handgun.

110. Seabolt testified that he photographed the firearms because it was "not natural behavior" to have firearms under the comforter, as he would not do it.

111. Seabolt admitted that he kept two loaded weapons in his home.

112. King elicited testimony that Seabolt has a family living with him so having loaded firearms on his bed would be dangerous.

113. King elicited testimony that Seabolt did not believe the location of the loaded firearms would pose such a threat if the owner were single and lived alone, like [petitioner].

114. King elicited testimony that Seabolt believed that how a person keeps his guns is up to the individual's choice.

115. King elicited testimony that Seabolt believed that the guns were all legal.

116. King properly and effectively used cross-examination of Seabolt to counter testimony that the location of the firearms was not normal.

117. King elicited testimony that Seabolt failed to mention the presence of dust in his report or make a supplemental report even though he had information that there had been a struggle at the car door, inspected the car door, and found the fact that the dust was undisturbed was significant to the case.

118. King elicited testimony that Seabolt knew he should have put the information regarding the dust in the report.

119. King elicited testimony that Seabolt neglected to
     note the significant dust information in his
     report, but he photographed and noted the location
     of [petitioner]'s irrelevant, legally placed
     firearms.

120. King elicited testimony that Seabolt's failure to
     include any information about the dust in his
     report was an omission on his part.

121. King attempted to impeach Seabolt's credibility
     regarding the discovery of the dust on the vehicle
     by highlighting the fact that he did not put any
     information about the dust in his report while he
     noted the firearms.

122. [Petitioner] testified he had already made his bed
     with his guns underneath the covers before the
     incident.

123. [Petitioner] testified that he hides his firearms
     in his bed when he leaves the house in case
     someone breaks in.

124. [Petitioner] testified his guns stay loaded and
     leaned in the corner of his bedroom while he
     sleeps, but he puts them in his bed when he gets
     out of bed.

125. [Petitioner] testified he generally leaves the
     guns in his bed every day because they would be
     easily taken from the corner of his bedroom.

126. The State did not bring up the guns found in
     [petitioner]'s apartment during its opening
     summation argument.

127. King tactically used the picture of the long guns
     to argue Seabolt's testimony regarding the
     presence of the dust was unbelievable because
     Seabolt would not take pictures of irrelevant
     items but fail to collect evidence of, notate in
     his offense report, or take pictures of the
     extremely relevant dust.

128. The State argued during closing summation that "I
     know you saw a lot of evidence in this and we saw
     big guns and we saw little guns."

129. The State did not portray [petitioner] as a gun nut during the guilt/innocence phase of trial.

. . .

131. There is evidence that King's apparent trial strategy regarding the firearms in [petitioner]'s bed was reasonable.

132. During deliberations on guilt/innocence, the jury sent out a note requesting the photographs of [petitioner]'s truck, the bullet entry, and the victim's T-shirt but not the photograph of the firearms in [petitioner]'s bed.

133. Considering the fact the jury did not hear about the firearms in [petitioner]'s bed until after King's motion to suppress was denied, there is no evidence that a reasonable likelihood exists that the out come of the proceeding would have been different had King filed a motion in limine.

134. In light of the strength of the State's case and the weakness of [petitioner]'s self-defense case, there is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had King objected to the firearms found in [petitioner]'s bed.

Closing Argument - Victim's Son's Credibility

135. After the victim's son's testimony, King commented to Hudak that he felt the victim's son testified extremely well.

136. During closing argument, the State repeatedly argued that the jury was the sole judge of credibility.

137. King argued during closing argument that the jury should believe the victim's son's testimony that the victim told [petitioner] firmly to get out of the car.

138. During closing argument, King stated the following:

        "And you can't -- you know, the thing

24

about cross-examination, you can't get into
somebody's head and just make the truth come
out. And let's face it, we all know the
reality is some people are capable of
presenting themselves in a credible way in a
court of law even when they're not being
truthful.

. . .

"Some people couldn't do that if their
life depended on it, but we all know there
are people that are capable of that. And you
just can't come in here magically with
cross-examination and make it happen."

139. In response to King's closing summation, the State
argued as follows:

"And who is [the victim's story]
corroborated by? [The victim's son]. [The
victim's son] is 13 years old. And he came in
here, and he sat in front of you, and I'm
sure he was nervous, and I'm sure this isn't
what he wanted to do on his summer vacation.
And I do not think that he came in here and
lied to you.

"And Tim got out his watch and timed it
and said, how long did this take? And [the
victim's son] counted out about five to six
seconds. That does not mesh with the story
that [petitioner] is telling you. It meshes
with the story that [the victim] is telling
you. And I don't think he would come in here
at 13 in a court of law and lie to 12 people.
He told you what he remembered."

140. The victim's son testified:

- [Petitioner] pulled into the victim's hangar
  in his truck.
- [Petitioner] was not screaming or yelling but
  was loudly asking "where is my money, where
  is my money."
- [Petitioner] appeared angry.
- The victim said, "Wayne, not now, my son is
  here."

- [Petitioner] cursed and used the "F cuss word."
- The victim told the victim's son to go upstairs.
- The victim commanded [petitioner] to get out of the truck.
- He never saw the victim walk towards [petitioner]'s truck.
- He only heard the gunshot because he could not see the victim or [petitioner] from his vantage point.
- He was only away for about five seconds when he heard the gunshot.
- When he returned to his father after the shooting, [petitioner] had left.

141. There is evidence that King's apparent trial strategy regarding not objecting to the State's summation was reasonable.

142. In light of the strength of the State's case and the weakness of [petitioner]'s self-defense case, there is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different had counsel objected to the State's closing argument.

Summary

143. After considering the entirety of the record, this Court[] finds there exists plausible bases in strategy and tactics for each of the complained of actions.

144. No affidavit is required from King because there is a plausible basis in strategy for counsel's actions.

145. Considering the totality of the representation, there is no evidence that King's representation fell below an objective standard of reasonableness.

146. In light of the strength of the State's case and weakness of [petitioner]'s self-defense case, there is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different but for the alleged misconduct

of trial counsel.

(SHR 272-89.)

Based on its findings, and relying largely on relevant state
law, the state court concluded that the inability to obtain an
affidavit from King did not relieve petitioner from complying
with the requirements of *Strickland* or change the presumption
that counsel's conduct fell within the wide range of reasonable
professional assistance. (Id. at 289-93.) Thus, applying the
*Strickland* standard, the court concluded that counsel's failure
to object to Quintana's testimony that she believed the victim
did not cause petitioner's injuries based on what she observed
was reasonable because the testimony was admissible as a matter
of state law and was not objectionable; that counsel's failure to
object to the use of the term "victim" was reasonable because the
term was "mild and non-prejudicial" and commonly used at trial;
that counsel's failure to object to evidence and testimony about
the long guns was reasonable trial strategy because the trial
court denied his motion to suppress the evidence and he used the
evidence to his benefit during cross-examination of the officers;
and that counsel's failure to object to the state's closing
argument regarding the victim's son's credibility was reasonable
trial strategy because he used the son's testimony to impeach the
victim during his closing argument. (Id. at 293-301.) The court
also concluded that based on the reasons stated, in conjunction

with the strength of the state case and relative weakness of petitioner's self-defense case, petitioner failed to prove prejudice as a result of counsel's acts or omissions. (Id. 301-03.)

Petitioner asserts that the state court's determination of his claims involved an unreasonable application of United States Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence presented. (Pet'r's Br. 8.) Specifically, he contends:

> A federal court should not presume that King exercised sound strategy in failing to file a motion in limine and object to the testimony and argument in question. [Petitioner] unsuccessfully requested an evidentiary hearing after King refused to answer counsel's questions during the habeas investigation. Thereafter, King disregarded a court order to file an affidavit and committed suicide. King, not Griffith, is responsible for the record not reflecting why he failed to file motions in limine and object to the matters in question. His refusal to answer counsel's questions and to file the court-ordered affidavit should be construed as admissions by silence that overcome the presumption that he exercised sound strategy. Additionally, [petitioner] presented an unrebutted affidavit from Brian Wice, an experienced post-conviction lawyer, that no sound strategy could justify the omissions in question.

(Id. at 11-12.)

Petitioner, however, cites to no United States Supreme Court precedent, and the court finds none, supporting his proposition that the silent record as to counsel's reasons for action or inaction, without more, necessarily inures to his benefit. "A defendant cannot overcome the presumption [that trial counsel's

actions or omissions were the result of reasonable professional judgment] simply by relying upon a silent record occasioned by faded memory or, worse, the death or illness of counsel." *Anderson v. United States,* 182 F.3d 921, 1999 WL 439410, at *3 (7th Cir. 1999) (citing *Michel v. Louisiana,* 350 U.S. 91 (1951)), *cert. denied,* 528 U.S. 1066 (1999). This does not mean, of course, that counsel's actions or omissions can never establish deficient performance. Indeed, in some cases the nature of the errors are so overwhelmingly prejudicial that counsel could not have had good strategic reasons for inaction. But, in light of the state court's determination that the complained-of evidence was admissible under state law and unobjectionable and/or involved matters of reasonable trial strategy, the inaction here does not look to the court like solid evidence of ineffective assistance of counsel sufficient to overcome the presumption of constitutionally acceptable performance. *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or frivolous objections).

Nor are the state court's factual findings based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings. Reviewing all the evidence, the record fairly supports the state court's factual determination that counsel's failure to file a motion in limine and object to the complained-of testimony had a plausible basis in tactics or strategy and was not merely oversight or neglect. "Even if '[r]easonable minds reviewing the record might disagree' about the finding in question,' on habeas review that does not suffice to supersede the [state] court's . . . determination." *Wood,* 558 U.S. at 301 (quoting *Rice v. Collins,* 546 U.S. 333, 341-42 (2006)). That another attorney may have proceeded differently does not render counsel's chosen course deficient. As the United States Supreme Court has noted: "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The relevant inquiry is not whether another attorney, with the benefit of hindsight, would have presented the defense differently or whether this attorney could have made other choices in defending petitioner, but rather, whether his attorney's decisions were reasonable under the circumstances. The record supports the conclusion that they were.

The state court applied the correct legal standard and its application of the *Strickland* test was not unreasonable or an unreasonable determination of the facts based on the evidence

before the court.

For the reasons discussed herein,

The court ORDERS that the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied. The court further ORDERS that a certificate of appealability be, and is hereby, denied.

SIGNED August **16**, 2019.

JOHN McBRYDE
UNITED STATES DISTRICT JUDGE